CASE No. 848.

THE STATE, *EX RELATIONE* BROWN, v. C. & L. R. R. CO.

1. A judgment upon the merits dismissing an action brought by certain taxpayers of a county against the county commissioners to enjoin the issue by them of certain railroad aid bonds, is an estoppel to a subsequent action after the bonds have been issued, brought in the name of the state upon the relation of certain other taxpayers of the same county, against the county commissioners, the railroad company and purchasers of the bonds, to have the bonds adjudged illegal and void.

2. A county having issued certain railroad aid bonds after a decree of the court had determined that the county had the power to do so, all persons purchasing such bonds become privies to the decree, and may rely upon its estoppels.   *Gelpcke* v. *City of Dubuque*, 1 *Wall.* 175, referred to.

3. A statement in *State, ex rel. Harris*, v. *Robertson, county treasurer*, MS. Dec., Nov., 1877, explained; and the dissenting opinion in *Glenn* v. *County Commissioners*, 6 *S. C.* 412, approved.

4. In our state constitution there is no restriction which deprives the legislature of the power to authorize counties to incur obligations and issue bonds for their payment.

Before Pressley, J., York, March, 1879.

For a proper understanding of this case, it will be well to read the case of *Glenn* v. *County Commissioners of York,* 6 *S. C.* 412. In that case, Glenn and others, taxpayers of the county of York, brought their action against the county commissioners of York, to enjoin the issue of $100,000 in county bonds to pay for a subscription made by the commissioners for the county to the Chester and Lenoir Narrow Guage Railroad Company, without any vote by the people. The defendants there admitted the subscription, and that the bonds were about to be issued, but claimed the power to make such subscription and issue such bonds under Section 11 of the act incorporating such railroad company, (15 *Stat.* 395,) which reads as follows:

"Section 11. That it shall be lawful for any county or town interested in the construction of the said Chester and Lenoir railroad to subscribe to the capital stock of said company, or of any company with which it may consolidate or unite, such sum, and to be payable in such manner as the people, or proper authorities of such county or town shall deem best, determine, and authorize; and in all meetings of stockholders, the county commissioners of the respective counties, and the town councils of the respective towns, shall appoint some person to represent the stock of their respective counties and towns: *provided,* that the property of said railroad company, situated in this state, shall be subject to taxation during the existence of their charter."

The Circuit judge held that the commissioners had the power to subscribe and to issue bonds, and dismissed the complaint, with costs. The plaintiffs appealed, and in 1874 the appeal was dismissed by a majority of the court, but no opinion filed, and Willard, A. J., dissenting.

The present case was instituted in April, 1878, in the name of the State of South Carolina upon the relation of F. H. Brown

and sixteen others, taxpayers of York county, against the Chester and Lenoir Railroad Company, the county of York, the commissioners of York county and several other defendants, then owning or holding bonds of the county of York, issued by the commissioners of York county to pay for subscription of that county to the capital stock of the Chester and Lenoir Railroad Company. The complaint alleged that there was no authority for the subscription or the issue of bonds, and that they were null and void; and it prayed that the bonds might be adjudged illegal and void, and the defendants required to deliver them up for cancellation. The defendants, in their several answers, claimed that the bonds were legal, and protected by the decision in the former case. There were other issues involved, but they were suspended to await the single question, are the bonds valid? Trial was had on the pleadings in this case, and the record in Glenn *v.* County Commissioners. From the pleadings here it appeared that all of the bonds in existence had passed out of the hands of the county of York, and also of the railroad company, and were held by purchasers for value, and as collateral security for an obligation of the company.

The Circuit decree is as follows:

This case was heard by me on the pleadings, which, together with the acts of the legislature and the case of Glenn and others, hereafter referred to, sufficiently show the facts and issues involved. I have always regarded the said case of Glenn et al. *v.* County Commissioners, as a final decision of the whole matter now involved. The Circuit judge certainly decided it upon its merits, and the motion to reverse his judgment was dismissed by the majority of the appeal court, from which Willard, A. J., dissented, and, assuming that the action of the majority confirmed the construction of the statute made by the Circuit judge, he fully states the reasons for his dissent.

In my opinion the terms of the act clearly fall within the class of cases of which the word "or" is construed to mean "and." Any other construction would make it confer power either upon the "people" or upon the proper "authorities" to make the subscription in question. But "the people" could not possibly exercise such a power without the concurrence of "the proper

authorities," unless some other agency were expressly provided for that purpose.  No such agency was provided in this case. It is therefore plain that the act intended that the people and the proper authorities should not act in the alternative, but that both should act in concurrence.

Since the case of Glenn et al. *v.* County Commissioners was decided, matters have transpired of which courts are bound to take notice, and which change very materially the aspect of the case.  Three general elections have taken place, at which the people of York county, if the majority had so desired, might have elected county commissioners who would have surrendered, or offered to surrender to the railroad company the stock which had been issued to the county in exchange for the bonds which are again called in question.  But no such action was taken, and the commissioners still hold the said stock as the property of the county, and do not in their answer even now offer to surrender it.  The act prescribes no special mode by which the proper authorities were to ascertain the sense of the people.  And it is now too late to do that by a vote; the road has been built through the county and is in daily operation; the people who are enjoying its conveniences and advantages may now very willingly vote to be freed from a tax to pay for it, and that without any danger of being thereby deprived of its benefits; their wishes in the matter at this time is not a question material to the proper decision of this case; the true issue is, whether or not the majority approved of the subscription at the time it was made; that could not be settled satisfactorily either by a vote now, or by the testimony of any number of witnesses, merely stating their opinion that the people would have voted for or against the said subscription; what they have done or failed to do at the general elections heretofore held, is the only test now proper.

I therefore hold that their long acquiescence has ratified the action of their county commissioners.

Further, as no clause of our state constitution prohibits the legislature from authorizing "the proper authorities of counties or of towns" to make such subscriptions, even without any vote or other concurrence by the people, it could have conferred that power in the said act if it so willed.  Not having previously

conferred it, such subscription made in excess of authority, or even without authority, might thereafter be ratified by the legislature. If so, then the act of March 5th, 1875, which authorizes a special tax in York county to retire the bonds which had been so issued, is a clear recognition of their validity, and, consequently, cures all excess of authority by the commissioners.

I cannot assume that the said act was passed by the legislature without its having had full knowledge of all the facts of the case. The appeal court had previously rendered its decision in the said case of Glenn et al. *v.* County Commissioners; and in that case the excess of authority by the said commissioners was fully and plainly set forth and discussed. It was matter of public notoriety, freely discussed everywhere in the state, and must have been well known not only to the members of the legislature from York county, but to the assembly generally. Besides, it was the duty of the legislature, before passing such an act, to inquire strictly into the facts of the case. And in the absence of all proof to the contrary, I am bound to presume that such duty was properly performed. Other matters, subsequently to the said act, all concur to show acquiescence by the people, and further confirmation by the legislature. Even the act of 1878, which suspends for a year the said act of 1875, makes it manifest that until such suspension the commissioners had been collecting the tax which the said act of 1875 authorized; and after such suspension, the tax act of 1875 still permitted the levy of a tax to pay the coupons on the bonds in question. Whatever, therefore, may be the force of the decision in the said case of Glenn and others, I hold that, without it, matters have since transpired, which, taken altogether, clearly establish the validity of the said bonds. And I consequently adjudge and deem that the complaint in this case be dismissed, with costs.

From this decree the plaintiffs appealed, upon the following grounds:

1. Because his Honor erred in deciding that the case of Glenn et al. *v.* County Commissioners, was a final decision of the matters involved in this action.

2. Because his Honor erred in deciding that the people of York county had ever, in any manner or form, by any free action

upon their part, approved, acquiesced in, or ratified the subscription made to said railroad company, without their consent and against their will.    The fact being that said people have, at all times and under all circumstances, as far as it was in their power, protested against the said subscription, and denied that it was binding upon them, as the plaintiff is ready to prove.

3. Because his Honor erred in deciding that the legislature of the state had the constitutional authority to give validity by way of ratification to the action of the county commissioners in making the subscription and issuing the bonds in question against the will of the people.

4. Because his Honor erred in deciding that the legislature of the state have ever, by any act or acts, ratified or made valid the said subscription by the county commissioners or the said bonds after they were issued.

5. Because his Honor erred in deciding that the said bonds are valid and binding obligations of the county of York.

6. Because his Honor erred in dismissing the plaintiff's complaint.

7. Because, it is respectfully submitted, his Honor should have decided that the said bonds were issued absolutely without authority and are void, and should have granted the relief prayed for in the complaint.

8. Because his honor should have decided that Section 11 of the act of February 26th, 1873, was in violation of Section 20 of Article II. of the constitution of the state, and had not the force of law.

9. Because his Honor should have decided that, inasmuch as the people of York county had not accepted the privileges named in Section 11 of the act of February 26th, 1873, they could not give validity to the void action of the county commissioners in making the subscription and issuing the bonds in question by acquiescence, or other alleged acts of ratification on their part.

10. Because, it is respectfully submitted, his Honor erred in deciding the cause on questions of fact that were reserved by written agreement of counsel.

The appeal was heard at the April Term, 1879.

*Messrs. LeConte* and *Patterson & Gaston,* for appellants.

The bonds were issued absolutely without authority. The act, (15 *Stat.* 393) conferred no authority upon the commissioners to subscribe or issue bonds. See dissenting opinion and argument for appellant in 6 *S. C.* 412. The legislature had no power to enforce obligations upon the county of York, except upon consent of her people. Counties are only agencies of the general government to aid in the administration of general laws in their several districts. *Dillon Mun. Corp.* § 10. There is no such thing as a county government. There is nothing in Article IV., Section 19 of our constitution, which contradicts this fundamental principle. The term jurisdiction carries the meaning of the power to administer, not to make laws. The general assembly must determine the necessity; the county have jurisdiction to carry out and administer. Compare with Article IX., Section 9. Again, counties are not named in Article IX., Section 9. Here is cotemporaneous exposition. See the several acts relating to county commissioners.. Counties are only sub-divisions of the state, created as instrumentalities of the state government, to subserve the administrations of the general laws of the state in their particular localities. The constitution does not seem to contemplate their incorporation. *Art. II.,* § 3; *Art. IX.,* § 9. But having a corporate form, advantage is taken of this to endow them with powers and privileges which are private as respects the rest of the state, although public in respect of the inhabitants of the county. It is upon this that the questions to which this argument is directed must arise. As respects the acquisition and enjoyment of such special powers and privileges, what are the relations which the county bears to the state, and what control has the state legislature over it? As to such matters, the county corporation is upon the same footing with a municipal corporation fully developed, and indeed a private corporation. The legislature has no compulsory power over it, and can do no more than to grant the power or privilege, subject to the right of the corporation to accept or reject it at its will. *Cooley on Const. Lim.* \*231; 28 *Mich.* 228; 13 *Wis.* 37; 29 *Wis.* 413; 51 *Ill.* 17; 2 *Am. R.* 278; 53 *N. Y.* 128; 4 *Wheat.* 694. It is said that

all this is met by _State_ v. _Charleston_, 10 _Rich._ 491; so it is as to cities or towns, which possess a complete representative government. But in the case of a county, who represents the corporation? Certainly not the commissioners who are administrative officers of the state not of the county. The people of a county have no one to act for them, and must speak for themselves. It is a mockery of free government to say that a legislature representing thirty-three counties, can, at will, dispose of the property or fortunes of the people of York county, either directly or indirectly, by accepting, as the will of the people, the consent of a board of petty officials elected to fulfill certain subordinate functions, as the agents of the state in the county. _Locke's Essay on Gov._, § 142. Nor can they raise taxes upon the property of the people without the consent of the people.

If the legislature had, itself, the constitutional power to determine this subscription and authorize these bonds without regard to the will of the people of York, still it could not delegate this power without restriction to be exercised by subordinate functionaries, appointed for purposes wholly foreign to the exercise of such powers. 6 _S. C._ 436; _Cooley on Const. Lim._ *116, *119.

Section 11 of act, (15 _Stat._ 393,) is in violation of Article II., section 20 of the constitution.

The bonds being absolutely void, have not acquired validity by reason of any matter subsequent to their issue. Not by acts of the legislature. 15 _Stat._ 865; 16 _Stat._ 485. These acts are not validating acts. 4 _Otto_ 269. Could it be supposed that a legislature which prohibited county commissioners from building a poor-house, without a vote of the people, (15 _Stat._ 989) would have stultified itself by sanctioning action here.? As to purpose of second act, see _House Journal,_ 1877–78. Not having power to authorize, the legislature could not validate. _Cooley on Const. Lim._ *381; 13 _Wis._ 37. The bonds did not acquire validity under judgment in Glenn _v._ County Commissioners. The plaintiff here was neither party nor represented. 2 _Dill. on Mun. Corp._; 2 _Duer_ 664; 18 _N. Y._ 115; 23 _N. Y._ 318; 26 _Mich._ 264; 2 _Bligh,_ (_H. L._) _N. R._ 312; 10 _Rich._ 491. Glenn and his associates were individual taxpayers, suing on their own

account alone.   If capacity to sue, they represented only themselves.   5 *Rich. Eq.* 342; 11 *Gray* 436; *Lleady* 610; 17 *How.* 130.   See remarks in *State, ex rel. Harris,* v. *Robertson,* MS., Dec., 1877.   The order of the Supreme Court in the Glenn case does not show that it was final.   It does not appear that issues were decided.

The bonds have not become valid by reason of any act or thing done by the people of York county.   The acquiescence of the people of York county was specially reserved, and was not before Judge Pressley at all.   We were prepared to show that every thing had been done in protest, which a people could do.   Only two elections were afterwards held, and if stock was held up to filing of complaint, the action of commissioners could not estop the people. . 10 *Wall.* 676.   If the bonds were void, the doctrine of estoppel can have no application.   *Dill. on Mun. Bonds,* 52, 53; 20 *Wall.* 655.   But defendants knowing how the bonds were issued, cannot claim the benefit of an estoppel; nor could claim of *bona fide* holder avail when there is total absence of authority to issue.

*Mr. J. F. Hart,* contra. .

Both state and relators are estopped from bringing this action.   The state is estopped.   15 *Stat.* 395; 6 *S. C.* 412; 15 *Stat.* 865, § 7; 16 *Stat.* 485; and in connection with the fact that York and Chester were the only counties authorized by law to levy a tax to retire bonds issued in aid of railroads, 16 *Stat.* 288 and 797.   The state is estopped.   10 *Rich.* 499.   The relators here are also estopped.   In using the word " parties " in Harris v. Robertson, the court meant to include privies.   If not, then who were the parties in the Glenn case?   As the plaintiffs there were taxpayers, then all taxpayers are bound.   *Code,* § 142.   Otherwise, every taxpayer might bring his separate action.   And all people of York are bound, because the county commissioners were parties.   The judgment there bound the county and all people in it.   10 *S. C.* 141; 7 *Otto* 376; 29 *Iowa* 197; *Freem. on Judg.,* §§ 174, 176, 178.

If plaintiffs are not estopped, then it is submitted that original subscription and issue of bonds were authorized. *Const., Art. IV.*, § 19; *Art. IX.*, § 8; 1 *Dill. on Mun. Corp.* 233. Such was the intent of the legislation. 15 *Stat.* 865; 16 *Stat.* 288, 485, 797. This is cotemporaneous legislation, to which we may resort in cases of doubt. *Pot. Dwar.* 136, 189 *and note;* 191 *and note;* 5 *Cranch.* 1. If "or" means "and," as intimated in the Circuit decree, the execution of the bonds by commissioners alone would make them valid. 5 *Wall.* 784. If power was not fully conferred in original acts, defect has been cured by subsequent legislation. 10 *Rich.* 494; 16 *Wall.* 663; *Dill. on Mun. Corp.*, §§ 46, 424; 2 *Rob. (La.)* 209. If these acts do not purport to be validating acts, it is of no consequence—the form is not material. 7 *Wall.* 619; 22 *Wall.* 75; 95 *U. S.* 653; 121 *Mass.* 460; 76 *N. C.* 489; 66 *N. Y.* 129; 57 *N. Y.* 177; 5 *Wall.* 203.

The act of the commissioners has been ratified by the people of York, as held by the Circuit decree from the pleadings, the statutes of the state and other matters within judicial cognizance. 19 *N. Y.* 218; 17 *N. Y.* 453; 24 *Ill.* 90; 5 *Wall.* 772; *Dill. on Mun. Corp.*, § 385.

The legislature has recognized, the courts sanctioned, and the people ratified these bonds. If Glenn *v.* County Commissioners was wrong, it cannot now be reversed so as to affect these bonds. 22 *Iowa* 11; 8 *Wall.* 584; 1 *Wall.* 175; 16 *How.* 432; 3 *Wall.* 330. If all these positions are erroneous, neither the county of York, nor its people can repudiate the contract with the defendant railroad company while holding its stock. *Sedg. on Const. Law* 90; 19 *Wall.* 678.

On September 19th, 1879, this court passed the following order:

It is ordered that the above-stated case be re-argued at the next term of this court. The attention of counsel is especially directed to the following questions, some of which were not fully noticed in the former argument, viz:

1. Does the constitution of 1868 constitute the several counties of this state corporations?.

2. If it does not, has the general assembly power to do so?

3. Has the general assembly the power to confer upon the board of county commissioners the right to issue negotiable bonds for the purpose of aiding in the construction of a railroad ?

*Messrs. Simonton & Barker*, for the affirmative.

The constitution has either created counties corporations, or contemplates their creation into corporations by the general assembly. *Const.*, *Art. IV.*, § 19. This recognizes the county as a unit, distinct from the state. Article IX, section 8, shows that counties are or can be made corporations. Compare this with the next succeeding section. The eighth section speaks for the present; the ninth commands for the future.

It is claimed, however, from *Art. II.*, § 3, that there is no change from our old judicial districts, except in name. The last sentence in the same section says that each county shall constitute an election district. Up to that time, election and judicial districts were distinct, in fact, and in their history.

In order to explain our position we must go into a brief examination of the history of the state.

From the earliest settlement of South Carolina down to the adoption of the constitution of 1868, the entire government of the commonwealth was in the hands of the legislature. With the exception of a few incorporated towns, the whole municipal administration was exercised and supervised directly by the general assembly. All the taxes were levied by that body. The whole proceeds of taxation went into the state treasury. Every dollar, for every purpose, general or special, from the building of the state-house to the erection of a county jail, was appropriated and expended under an act of assembly. From the most petty item of expenditure—the costs of a constable for serving a warrant—to the millions expended in internal improvements, the appropriation had to be made by a bill originating in the house of representatives, and passed with all the formalites required by the constitution. There were no district taxes; no district funds; no district purposes, in which the people of the district had any exclusive *control;* indeed, had

any voice whatsoever. An election district sent its senator and representatives to Columbia, and furnished its taxes. But, except in the share which these representatives had in the vote of their respective houses, the district had no voice or claim in the disbursement of the money they raised. For very many years, indeed, down to a period not very distant, every official in the state was elected or appointed by the general assembly— governor, judges, clerks, sheriffs, ordinaries, tax collectors, justices of the peace, magistrates, managers of election, commissioners of the poor, of public buildings, of free schools, of roads, bridges and ferries. And, notwithstanding the spread of democratic doctrines throughout the Union, and in spite of many efforts to the contrary, the majority of these offices continued to be filled by the general assembly until the new constitution of 1868 was adopted. The local officers, especially the commissioners of the poor, of public buildings, of free schools, of roads, bridges and ferries, appointed by, were directly responsible to the legislature—made their annual reports to, and got their instructions from that body. Annually the comptroller-general reported their accounts, and the accounts of every public servant in the districts, to the general assembly; and on such report, and upon reference to and an examination by committees of each house—an examination going into every item of charge—the accounts which were allowed were paid by the state treasurer, after an appropriation for that purpose. The state was a thoroughly centralized government; and, with the exception of a few towns and villages, there was no form of municipal government—distinct, self-supporting—within the limits of the state.

There have been in South Carolina three kinds of territorial divisions—counties, election districts and judicial districts.

Originally there was, apparently for convenience in territorial designation, counties, such as Craven county, Berkeley county, Granville county and Colleton county, with outlying precincts, such as Ninety-six, the Cheraws, Camden, and so forth. Afterwards, as the up-country became more settled, these outlying precincts were sub-divided into counties, bearing, for the

most part, the same names they now do—Abbeville, Fairfield, Chester, and so forth. 1 *Brevard Dig.* 253.

The judicial districts were formed for the more speedy and convenient trial of causes in the Court of Common Pleas and General Sessions.

Originally, the only court in the province was held at Charles Town. This proving the cause of great inconvenience, circuits were established, and the province was divided into precincts or districts. *Brevard* 219. Charleston precinct embraced all the territory between the Santee, Combahee and the sea; Beaufort precinct, all the territory between the Combahee and Savannah rivers and the sea; Orangeburg, between the Savannah, Santee, Congaree and Broad rivers, extending beyond Newberry. 1 *Brevard Dig.* 256. In 1798, these precincts or districts were sub-divided into smaller districts, following very much the boundaries of the counties which had been previously fixed, but not so absolutely or in every instance. For instance, Sumter district was composed of Claremont, Clarendon and Salem counties; Kershaw district comprehended Richland and Kershaw counties; Orangeburg district comprehended Orangeburg, Lexington and Newberry counties; Georgetown district embraced Williamsburg, Kingston and Georgetown. The purpose of this act was declared to be a more easy, certain and uniform system of judicature, by the establishment of courts under proper regulations in districts of convenient dimensions. This division, however, was in no sense political or municipal. The districts were not organized—had no powers and no duties. They only formed the boundary lines within which process from a particular court-house ran.

The third division of the state was into election districts. These, in some instances, covered the same territory as the judicial districts. In others, as in Charleston, Beaufort, Colleton, Georgetown, Sumter, Horry and Orangeburg, they were widely different. Charleston judicial district had, within its limits, ten election districts, distinct, separate, independent of the judicial district. Georgetown and Horry each had one and a half, dividing All Saints between them. Some election districts, although they had the same boundaries as the judicial district,

had distinct names—Lexington district was represented in the legislature as Saxe Gotha; Marion as Liberty. Each of the election districts had its separate tax collector, and they approached more nearly to our present idea of a county than any other division.

For very many years a political struggle was waged in the state, the object of which was to make the judicial districts and the election districts coterminous and the same. The war produced a change of power in the state, and the convention of 1865 nearly ended the struggle by making in all but one instance the desired change. Every judicial district in the state, but one, was made an election district; and in 1868, by the absorption of the district of Berkeley into Charleston, the entire change was effected.

The constitution of 1868 made all the judicial districts counties, gave to the legislature the right, under certain limitations, to make counties at its pleasure, and declared each county, existing and to exist, an election district.

The new county system had machinery provided for it, whereby the local concerns of each political sub-division should be administered by a board elected by and representing the county, specially charged with its local concerns of every description, and capable of possessing and of using power of taxation over the county, and of thus creating a county fund. This constitution was made by men who had had a wider experience than in South Carolina. They came from states in which counties had been in the habit of discharging some of the functions of government. When they used the word county, they meant something more than mere territory. With the abolition of the name district, a pecularity in this state, was effected a wide revolution. Instead of its centralized state government, South Carolina was placed on the plane of what Mr. Cooley calls the American system, which is "one of complete decentralization, the primary and vital idea of which is, that local affairs shall be managed by local authority, and general affairs only by the central authority." *Const. L.* 189. The result is, that in every matter—in all expenses incurred in the care of the poor; erection and repair of public buildings; payment of

juries, witnesses, constables; all expenses of court; salaries of county officers—the county is responsible, and provides for them out of the county funds alone. This was the practical operation, under the constitution, in every matter but the funds for educational purposes. And since the adoption of the last constitutional amendment, this has been brought within the general system, so that every dollar used for county purposes, is raised from taxes levied upon and collected in the county, and is expended in the county by the county officers. Each county raising and paying its own expenses, and the expenses of no other county. This revolution in the internal administration of the state forbids the idea that the counties of the constitution of 1868 are nothing more than the scraps of territory, called under the former constitutions, judicial districts, with no functions whatsoever.

Under second question, counsel cited *Gen. Stat.* 145; 19 *Wall.* 673; 7 *Otto* 376; *Cooley on Const. Lim.* 87, 173, 191; 15 *N. Y.* 543; 27 *Vt.* 142; 4 *Wheat.* 316; 16 *Wall.* 676; 13 *Ill.* 30; *Dillon on Mun. Corp.*, § 10, *a*.

Under third question, counsel cited 4 *Rich.* 382; 1 *Spears* 218; 8 *Leigh* 120; 15 *Conn.* 475; 9 *Hump.* 252; *Dillon on Mun. Corp.*, § 105 *a*; 19 *Wall.* 677; 1 *Wall.* 176; 16 *Wall.* 669; 19 *Wall.* 666; 1 *Black.* 39; 2 *Cl. & Fin.* 349.

*Messrs. J. F. Hart, Hemphill & Hemphill, Rion, Witherspoon & Spencer*, on same side.

*Messrs. LeConte, Patterson & Gaston*, contra.

In addition to the authorities in their former argument, counsel cited as follows:

1. 1 *McM.* 222; 1 *Spears* 218; 4 *Rich.* 382; 10 *Pick.* 172; 23 *Wend.* 103; *Potter on Corp.*, § 432; 1 *Dillon on Mun. Corp.*, § 22.

2. 9 *S. C.* 1; 7 *Otto* 374; 11 *S. C.* 333.

3. 1 *Dillon on Mun. Corp.*, §§ 23–30; 2 *Id.* 445; 9 *B. Mun.* 330; 9 *Mo.* 507; 8 *Blackf.* 361; 21 *Ill.* 451; 17 *Wall.* 322; 1 *Otto* 540; 3 *Hill* (*N. Y.*) 531; 31 *Penna.* 175; 26 *La.* 478; 28

*Mich.* 228 ; 18 *Gratt.* 338 ; 1 *Black.* 39 ; 12 *Ohio* 375 ; 2 *Kent* 275 ; *Cooley on Const. Lim.* 230, 236, 238, *note* 2, 250, 251, 252, *note* 1 ; *Cooley on Const. Lim.* 117, 211–235, 287 ; 104 *Mass.* 87 ; 62 *N. Y.* 160 ; 9 *Mich.* 165 ; 40 *Conn.* 72 ; 15 *N. Y.* 543 ; 2 *Kans.* 215 ; 31 *Vt.* 226 ; 9 *Cranch* 43.

March 25th, 1880.   The opinion of the court was delivered by

WILLARD, C. J.   The leading question in this case involves the estoppels resulting from a previous action arising out of the same transactions.   The action is in the name of the state, upon the relation of citizens and taxpayers of York county, to have certain bonds for the payment of money issued in the name of the county of York declared null and void, as issued without due authority of law.   The defendants are the Chester and Lenoir Railroad Company, to whom the bonds in question were issued, certain parties claiming to have some right or interest in the said bonds derived from the railroad company subsequent to their delivery by the county commissioners to such railroad company and the county commissioners of said county.

It is alleged that a suit was brought prior to the issue of such bonds by the county commissioners, and while such issue was in contemplation, by Glenn and others, as citizens and taxpayers of York county, to test the authority of the county commissioners to issue said bonds, and an injunction prayed to restrict them from issuing the same ; that the Circuit Court refused such injunction and dismissed the complaint, and that such judgment was affirmed on appeal to this court ; that under the decision of that case and deeming it authority for so doing, the said county commissioners issued said bonds, and they came to the possession of the parties holding them as to *bona fide* purchasers for a valuable consideration and without notice of any defect.

The question of the effect of the judgment in the case of *Glenn* v. *County Commissioners,* 6 *S. C.* 412, upon the present case, involves two inquiries.   *First,* as to its effect on the right of the present plaintiffs to maintain their action, which is alleged to be upon the same cause of action, and substantially between the same parties.   *Second.* What right, if any, the present defendants acquired in virtue of the fact of having, since the rendition

of such judgment, become invested with the rights that were the subject of controversy therein. The first of these questions is substantially identical with that which would have been raised by a former plea of a former recovery between the same parties, on the same cause of action, while the second inquiry has a large scope and involves the whole effect by way of estoppel of the judgment in the case of Glenn v. County Commissioners, in sustaining the rights which they claim to have acquired under that judgment.

We will consider, in the first place, whether the action of Glenn v. County Commissioners is to be regarded as a former recovery upon the same cause of action and between the same parties as those involved in the present case. If this had been an action in the nature of a suit at common law, and the defence of a former recovery made upon the record of a judgment in an action at common law, the question would have had a more restricted character than in the present case, as it would have to be determined in view of the legal effect of a judgment record at common law. The action of Glenn v. County Commissioners was in the nature of a bill in equity, and the present action is of the same nature. Equity will not permit a matter once formally adjudicated to be re-opened between the same parties or those holding under them under its decree in a collateral proceeding. The remedy of parties and privies for any errors of fact or law that may be found in a decree, is by appeal or petition or bill of review. A formal proceeding by way of review is, in substance, a prolongation of the original bill, and not in any sense a collateral proceeding. But this action is, in form and substance, a collateral proceeding. The complaint does not seek to re-open a decree and point out its errors for correction, but treats the former suits as void in toto for certain reasons therein assigned.

Is there, then, that degree of identity between the two actions that would authorize them to be regarded, as in substance and effect, between the same parties and concerning the same cause of action? As this question arises in equity, substance, rather than form, is to be looked at, as a consequence of the prevailing habit of equity. Is there, then, identity between the causes of action in the two cases? The question in the Glenn case was whether,

under the act of the legislature, which was claimed as authority for issuing the bonds, the county commissioners had a right to make the subscription to the stock of the Chester and Lenoir Railroad Company, and to issue the bonds of the county of York in payment therefor, without first submitting the question to a vote of the people or electors of the county, whether such subscription should be made? If that question was decided in the affirmative, then it would follow, as a consequence, that the prayer of the complaint for an injunction would be denied, and the county commissioners would be free to proceed and issue the bonds at their discretion. The question in the present case is identical with that just stated. The difference between the two cases, as far as it concerns the cause of action, is in the nature of the relief demanded. Glenn's case only sought an injunction, as no rights had been acquired at that time under the intended action of the county commissioners, but at the time of the commencement of the present action such right had matured, and the relief could not, to be effectual, fall short of a decree declaring such right to be invalid. It may be contended that the prayer for relief is not a test of the identity of the causes of action; it is enough to say that it is not in the present case. The controversy is the same throughout, resting on the same facts and views of the law. At one stage of the controversy one measure of relief is called for, while at another and more advanced stage that measure of relief may be inappropriate and different relief demanded. It cannot be questioned that two actions, brought at different stages of the same controversy, although moulded to the special circumstances existing at the respective times of their commencement, yet each tending to the same general result, must be regarded as involving the same cause of action. If the contrary was admitted, there would be no stability of rights under judgments, for the moment a transaction, even judicially sustained, passed into a new stage of development, it would be thrown open to question from its very origin. As applied to proceedings in equity, this view is sustained by the principles on which equity administers justice. The contrary would tend to deprive equity of that characteristic power of adapting itself to courts contemporaneous and successive, which is the ground on

which it has maintained itself, side by side, with the courts of common law.   It must be concluded that in substance and effect, and therefore in the view of equity, the two causes of action are identical.

It becomes necessary, then, to inquire whether there is a substantial identity as to parties.   The formal record in the case of *Glenn* v. *County Commissioners*, is not before us, so that we are compelled to take the title of that cause as it is reported in 6 *S. C.* 412.   It is there stated to be an action by E. L. Glenn and others, alleging themselves to be citizens and taxpayers of York county, against H. K. Roberts and others, as county commissioners.   The present action is in the name of the state upon the relation of certain other persons, alleging themselves to be citizens and taxpayers of York county, against the county commissioners of that county and parties who, since the case of Glenn was decided, have become holders of, or interested in, the bonds issued by the county commissioners.   As far as it regards the defendants, the identity is complete, as the addition of parties who have acquired an interest in the controversy since the judgment in the first case, is a circumstance consistent with the fact of the identity of the controversy in the two cases.   Had the case of Glenn continued undecided to the present time, and were the plaintiffs in that case seeking still the general results sought by the complaint in that case in some form to suit the condition of matters that have arisen since that suit was commenced, it would be a matter of prudence to make the persons who had acquired rights after the commencement of that suit parties, so that a direct decision upon their individual rights could be reached, which should act immediately, and not merely indirectly, upon them.   Parties acquiring an interest in the subject matter of a suit after action commenced, from or under the parties to such action, apart from the question of notice, are privies, and it certainly cannot be contended that there is a want of identity between the suits in equity merely because persons who are privies under the one are made parties to the other.

Are, then, the plaintiffs in the two cases to be regarded as, substantially, and in the view of equity, identical?   It is necessary to look to the character of suits like the present in order to

understand fully the nature of this question.   This belongs to the class of remedies proceeding, nominally, in the right of the state, but, actually, in the interest of a class of individuals having common rights that need protection.   It is, therefore, related to that more general class where individuals possess the right to represent the class to which they belong in respect of rights either common to the class, or competing as to a certain subject of property.   A bill to enjoin a common nuisance is an instance of this class, based on common rights, and a creditor's bill another, based on competitive rights.   This jurisdiction, in some respects, rests on the principles of a proceeding *in rem,* as the court of equity, through it, lays its hands upon a fund at the instance of some of the parties interested in it, and, by a proper proceeding, administers it with a conclusive effect upon the rights of all others having similar rights thereto.   Although equity, as a system, proceeds upon the ground of personal duty, and hence against persons rather than things, yet there are many instances where proceedings in equity partake of the nature of an action *in rem.*   Another principle that appears to be fundamental to such jurisdiction by means of class representation, has an analogy to the familiar principle of the law that where rights of a certain nature are common to large classes of persons, individuals may acquire, by prior occupancy, a superior right, whether temporary or permanent, over all others of that class in respect of such right.   The strict illustration of this principle is where such common right has its origin from the law of nature, as in the case of waste and unoccupied lands never subjected to individual right, and animals *feræ naturæ,* and the like.   Where many have a common right to the means of protection by a legal proceeding, this principle is suggested and would enable such as seek the remedy, with the advantage of priority, to have a superior right to prosecute such remedy.   Where there are competing rights in a single subject, equity recognizes and protects the priority by injunction, as in the case of a creditor's bill.   This right of representation is, however, from its nature, subject to the restriction that the door of controversy must be opened to all of the class represented, who may, on certain conditions, unite in exercising control over the prosecution of the remedy.

Common or public rights having their origin in the municipal law, are usually protected by the action of the public authority. In England that right of procedure is in the King or his attorney-general, while with us it is in the state. It is customary to allow private individuals having a personal interest in the protection of such rights, to use the name of the state for the purpose of protecting them, and, applying the principles of class representation, a portion of the persons of the community are enabled to become relators, such a proceeding being, in reality, the representatives of the class to which such relators belong.

Such is the nature of the present action. Whether the name of the state is indispensable in such proceedings need not be considered. If it is not, then in the present case its use may be treated with surplusage, and the nature of the case regarded as the same as if the action had proceeded wholly in the names of the persons here styled relators, as was the case in Glenn *v.* County Commissioners. If, on the other hand, the name of the state is indispensable, then the want of such name would have constituted a ground of defence in Glenn's case. As no such objection was made in that case, it must be treated as if it had been properly brought in the name of the state. In this view, the difference between the two cases would be resolved to that of a *misnomer* alone, and that equity, at least, would overlook.

We come, then, to the main question involved, as it regards the identity of the plaintiffs in the two cases. It is easy to see, from the principles already stated, that the rights that were represented in the former case are here attempted to be represented again for the same general purpose. The principle of representation is embodied in Section 142 of the code, as follows: "Where the question is one of a common or general interest of many persons, or where the parties are very numerous, and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole." It is clear that this language contemplated cases where the results of such an action would affect, finally and conclusively, a larger number of persons than those who are immediate parties, for the object of the section was to enable some of a class to act in a manner conclusive to others of the same class, by representing

them. Without the aid of this provision of the code, or the principles on which it was founded, the immediate parties could bind themselves; that in which they needed the aid of the statute, or the principles that existed prior to it, was that the subject of the controversy might be exclusively affected in such a way as to bind others not parties, but merely represented by others as such. The code, evidently, was not intended to exclude others who might choose to come in with those who assume to act as their representatives, but is consistent with the idea that if they stand out they will be bound by what is done in their name. It would follow that when plaintiffs, or relators standing in the place of plaintiffs representing a class of persons, bring an action based on such class rights and are defeated in such action on the merits, no subsequent action can be effectually brought by the same parties or by other parties of the class thus represented. This would dispose of the present appeal if it shall appear that the case of Glenn *v.* County Commissioners was decided finally and on the merits, provided the use of the name of the state does not interfere with the application of the principles that would apply had the present suit been maintainable and actually brought in the name of the relators without that of the state. This last proposition will be first considered. It is not reasonable to suppose that the state, in lending its name to individuals for the protection of their rights, intended to subvert the principles governing controversies of the class to which this belongs. We need not consider what would be the result if the state, having a substantial interest in this action, should claim that it was not affected by the case of Glenn, for that is not the case here. The state, as such, has no interest in the suit beyond the indirect interest of having protection afforded to the common and public rights represented by the relators. It must then be considered that the same principles apply to the present case that would apply had the relators been the only plaintiffs and capable of prosecuting as such. Then all that remains is the inquiry whether the case of Glenn *v.* County Commissioners appears to have been finally and conclusively decided upon the merits.

We will consider, in another place, the matters of fact and law decided in that case, but at present, the question is whether the disposition must be regarded as upon the merits of the controversy. If it appears that the bill was dismissed for lack of proper parties, for the want of a statement of a sufficient cause of action, or for defect of proof leading to a non-suit, then nothing would prevent its renewal in the form in which it appears in the present case. But can such a conclusion be drawn?

It is stated in the report of the case, (6 *S. C.* 415,) that "on August 16th, 1873, the cause was heard upon its merits before the Hon. Judge Mackey, who, on September 12th, 1873, filed the following order and decree."

The opinion of the Circuit judge is confirmed as to the merits of the case. He says: "I have considered the questions at issue solely upon their merits, and without interposing those technical rules of practice which would have justified the court, *sua sponte*, in dismissing the complaint." What would have justified the court *sua sponte* in dismissing the complaint is not stated, and as no defect of jurisdiction has been suggested as appears, cannot be conjectured, but it is quite apparent that no objection had been taken to matters of form, as then it would have been unnecessary to suggest the possibility of the dismissal of the complaint *sua sponte*. The decree was, then, clearly on the merits. The plaintiffs appealed from the decree, and, of course, only raised by way of appeal, questions of substance. The appeal was dismissed by this court, and that left the decree of the Circuit Court standing on the ground on which it was originally pronounced. It is true that the majority of this court did not state the grounds for dismissing the appeal, but that, though of interest in an aspect not at present under consideration, is of no importance to the present question. If it is assumed that the appeal was dismissed for irregularity and not upon the merits, that would not alter its effect, for it left the Circuit decree standing with the same force and effect that it had when first pronounced. It must be concluded that the Circuit decree in the case of Glenn *v.* County Commissioners was

a decision upon the merits, and in its nature final and conclusive and a bar to the present action.

Although it may not be necessary in order to dispose of the present appeal to go beyond the matters already discussed, yet the importance of the principles and the magnitude of the interests involved, render it appropriate that certain other questions raised in the case should receive consideration. Among these, one already noticed, is entitled to a place, namely, what is the effect, by way of estoppel, of the decree in Glenn *v.* County Commissioners, considered apart from the question of the bar of a future action created by such decree? Assuming that there was no formal objection to the maintenance of the present action, must the matters decided in the Glenn case be regarded as so far settled between the present parties that the record in that case is conclusive of all the allegations of fact and law in the present complaint? It is clear that the county commissioners, being parties to both suits, have a right to rely on the conclusive character of the decree in that case. If they had not, they might be placed in the position of having unlawfully issued the bonds in controversy, although at the time of issuing them they had the sanction of a decree of the Circuit Court in a suit to which they were parties, affirmed as the result of an appeal to the Supreme Court. The other defendants stand in the position of having acquired rights under the decree in question, and upon the faith of such decree. By the acquisition of such rights they became privies to the decree, and had a right to rely on its estoppels and were bound by its consequences. As such, they may allege the bar of the decree to any further agitation of the questions involved, as they would be precluded from averring against such decree, as it regards its effect upon the property acquired by them under the decree, had it gone against their interest, as effectually as if they had been parties to the suit in which the decree was rendered. It would not be questioned, if the subject of the former action was the title to land, that a decision thereon would conclude all parties becoming purchasers after judgment from parties bound by such judgment. In the present instance, the subject of the action was a *power* to issue bonds, and the question was its legal

validity, and the defendants, who have taken bonds under such power, may well contend that their *titles* were conclusively passed upon when the *power* under which it has arisen was judicially sanctioned. It would follow that in the present case they have the right to set up the decree as a bar and estoppel to any attempt to disturb the decision on which their title rests.

We have said in State *v.* County Treasurer, (MS., Dec., Nov., 1877,) that as the majority of the court who decided Glenn's case did not disclose the grounds of their decision, that this court is not committed to any view of the questions discussed in that case, and that the court deems all questions of law that arose therein as open and undecided, except so far as relates to the parties in that action. *Parties* here should be taken to include *privies ;* indeed, privies are always intended when a general reference is made to parties. This court concurs in the positions taken in the dissenting opinion in the Glenn case, and if the question was open before us would have no hesitation in placing the case upon such grounds.

This extension of the protection of a decree to those deriving their rights under it at any time subsequent to such decree, when in harmony with the technical rules that govern remedies and their effects, is demanded by a principle that has received its most unqualified statement in the case of *Gelpcke* v. *City,* 1 *Wall.* 175. It is there held that if at the time when municipal bonds are issued, the law, as expounded by the highest court of a state, sanctions the validity of such issue, no subsequent decision of the court can impugn the validity of such bonds by overruling its former decision. This principle is applied in that case in the most general manner, and without regard to whether the former decision was upon the power or authority to issue the particular bonds in question. It is, therefore, in effect placing the principle of *stare decisis* upon higher ground than it has ever before occupied. We are now compelled by the language of the case to believe that the Supreme Court of the United States intended to hold that a decision of a state court overruling a former decision, under such circumstances, becomes, in effect, a *law* of a state impairing the obligation of a contract, so as to become involved under the constitution of the United

States.   We cannot assume that that court intended to expand the constitutional sense of the word "law" so as to become a guaranty that no state court should violate the rule of *stare decisis* so as to affect contract rights.   Whatever difficulty may suggest itself as to the possibility of safely applying the principle in question in the naked form in which it is presented in the case just cited, it is easy to recognize the principle itself as just and suitable to be applied whenever the nature of our remedial system will admit of it.   In the present case its application is consistent with the rules governing the proper effect of remedies, and therefore justifiable.

It only remains to notice the objection that was raised upon the argument of the appeal, that the county of York, not being a corporation, bonds issued in its name are without validity. The question of the right of the county commissioners to issue the bonds of the county of York, that was presented in Glenn's case, necessarily involved the further question, whether the county of York is capable, legally, of making a valid bond, and therefore, it is manifest that the question cannot be re-opened in the present case.   If it could be, it would not be necessary to consider the broad question whether the county of York is a corporation.   It would be sufficient to ask whether it had legal power to contract obligations within the scope of its legitimate interests.   If it possesses such capacity, the only question would be whether the legislature had authorized its exercise, and that question is disposed of, as between the present parties, by the decree in Glenn's case.   It will be conceded, without difficulty, that it is competent for the legislature to confer upon the people of a county power to incur obligations binding upon them, as a community, unless forbidden by the constitution.   The argument before us has been mainly addressed to the question whether the constitution has created the counties into corporations, or so arranged their character and powers as to amount to exhaustive legislation on the subject, thus, impliedly, excluding the legislature from legislating either antagonistically or cumulatively on the same subject.   This view is not a necessary one to the matters at issue in the present case.   The true inquiry is, whether there is anything in the constitution that precludes the legislature from

permitting the counties to incur any obligation whatever in the nature of a contract; for the objection is such as would apply to any contract obligation whatsoever. It is impossible to find any clause in the constitution that admits of the construction contended for; but, on the contrary, there are provisions of a positive character from which it is reasonable to infer that the counties were intended either to have originally or from the legislature capacity to contract obligations necessary to the transaction of their local business.

Section 19, Article IV. of the constitution provides that "the qualified electors of each county shall elect three persons, for the term of two years, who shall constitute a board of county commissioners, which shall have jurisdiction over roads, highways, ferries, bridges, and in all matters relating to taxes, disbursements of money for county purposes, and in every other case that may be necessary to the internal improvements and local concern of the respective counties." Here is an express recognition of the capacity of the communities styled counties to have interests peculiar to themselves and not common with all other citizens of the state. The terms "local concerns" are of the most general character, and, that they are not intended to be confined to such matters of state administration as may happen to fall for execution within the territorial limits of the respective counties, is evinced by the provision for "internal improvements;" clearly internal improvements of a general character as affecting the state at large, or one or more counties were not here referred to as the administration of such improvements would not be committed to boards circumscribed by county lines, but to more general bodies, whose jurisdiction would be commensurate with the local extension of such internal improvements. It must then be understood that what may be called county improvements may be brought within the capacity of the counties as local communities. The words *internal improvements* admit, naturally, of an extended signification. It is left to the legislature to fix the character of the improvements that may be thus undertaken within the scope of the sense of the constitution. The right of improvement embraces power to create facilities that do not exist. The right to make improvements of a local

character implies power to acquire and hold property and to renew obligations and make contracts in relation to such property as ordinary means for that purpose. It cannot be doubted that if the legislature should authorize a county to purchase the road and franchises of a turnpike company and throw the road open to the public, that such a transaction would be an improvement in the sense of the constitution. To allow such a transaction is, impliedly, to allow an obligation to be contracted for that purpose.

Section 8, Article IX. of the constitution speaks of the "corporate purposes" of counties as objects for raising and expending county taxes, thus strengthening the view already presented, that these communites are capable of acquiring interests distinct and apart from such as concern the state at large; the limit is put by the constitution to the extent or character of such *corporate purposes.* That the community may have local interests calling for the expenditure of money is clearly recognized and provided for, and that implies the power of incurring obligations and of satisfying them.

It must be concluded that there is no constitutional restriction depriving the legislature of the power of authorizing counties to incur obligations, and that is decisive of the question under consideration.

The judgment must be affirmed and the appeal dimissed.

McIVER and McGOWAN, A. J.'s, concurred.